# EXHIBIT 3

SAN DIEGO COUNTY PROBATION DEPARTMENT

ADULT SERVICES

PROBATION OFFICER'S REPORT

| THE PEOPLE OF THE STATE OF CALIFORNIA | COURT NO.<br>CRN 20484 | DEPT. & JUDGE<br>VSC "A" |
|---|---|---|
| v. | DA FILE NO.<br>B 5941301 | ATTORNEY   APPT X<br>D. RAWSON   RET ___ |
| RN: HAMMONS, JEFFREY TODD | | |
| CN: HAMMONS, JEFFREY TODD | HEARING DATE/TIME<br>1-3-92  9:00 a.m. | PROB CASE NO.<br>A 720 948 |
| AKA: | PROBATION OFFICER<br>K. FEATHERSON:lmn | PO TEL. NO.<br>940-4407 |

| ADDRESS<br>608 Norton Street<br>Waterford, TX | TEL. NO.<br>(817) 599-5744 | BIRTHPLACE/CITIZENSHIP<br>Dallas, TX |
|---|---|---|

| BIRTH DATE<br>11-24-66 | AGE | RACE<br>W | SEX<br>M | HT<br>5'7" | WT<br>150 | EYES<br>bro | HAIR<br>bro |
|---|---|---|---|---|---|---|---|

| SOC. SEC. NO.<br>407 98 3776 | DRIVER'S LIC. NO. | INS. NO. | | OTHER ID DATA |
|---|---|---|---|---|

| DATE OFFENSE COMMITTED<br>12-10-90 | DATE CONVICTED<br>12-4-91 | HOW<br>Jury | CUSTODY STATUS<br>VI UI |
|---|---|---|---|

| INVESTIGATING ARRESTING AGENCY<br>OPD | DATE INFORMATION FILED<br>6-27-91 | SDSO SYSTEM NO. |
|---|---|---|

| CII NO.<br>0978 3599 | FBI NO.<br>3130 33NA4 | ARREST REPORT NO. | SDSO BOOKING NO.<br>91139 953 |
|---|---|---|---|

**CONVICTED OF:**

Count One, 187(a) PC - Second Degree Murder with a 12022(a)(1) PC allegation.

**CODEFENDANT(S):**

Todd Thornton pled guilty to 192(a) PC - Voluntary Manslaughter LIO Count I with a 12022(a) PC allegation. He is scheduled for sentencing 1-21-92.

**PRE PLEA BARGAIN:**

None, verdict by jury.

**RELATED COURT DATA:**

The defendant was found not guilty of First Degree Murder on Count One. A mis-trial was declared for a Count One 12022.5 PC and 12022.5(a) PC allegations and Count Two, 211 PC - Robbery.

**RECOMMENDATION:** State Prison

## THE OFFENSE:

SOURCES OF INFORMATION for this section

DA files including preliminary transcripts, Oceanside PD reports, and telephone contact with Defense Attorney David Rossen - 12-23-91, Deputy District Attorney Jim Koerber - 12-24-91.

---

On the night of 12-10-90, victim Carlos Santana telephoned the Oceanside Police twice. After the first call, an officer met him at the Oceanside Transit Center where he reported leaving his jacket in a car occupied by two Marines. The jacket contained his glasses and $26. Victim Santana, a prostitute, stated that he did not want to make a formal report or cause trouble since it was Christmas. He requested that his goods be returned if the Marines were located and he provided the description and license plate number of their car. At the end of the contact, he stated that he lived at the Wally Johnson Motel. (Police subsequently discovered the jacket lying in the street in front of the Travel Lodge, 1401 North Hill Street).

Approximately 15 minutes later, police received another call from victim Santana. He stated that he was in front of the Wally Johnson Motel watching the car he identified earlier. He provided the vehicle license plate number (QCM837) again and requested police assistance. A dispatcher put him on hold, then attempted to direct a police unit to his location.

A short time later, police received several emergency calls stating that the victim had been shot. Officers, responding to these reports, found him lying on the sidewalk in front of the Wally Johnson Motel. They determined that he had been mortally wounded from a gun shot to the upper torso. He was pronounced dead at the scene (11:50 p.m.), then transported directly to the medical examiner's office. An autopsy was subsequently performed. Autopsy results indicated that he died of a gun shot wound to the neck and chest.

Police questioned three witness, Robert Bousfield, Glen Newman and Michael Roth at the scene. Bousfield and Newman subsequently testified at the defendant's preliminary hearing. Bousfield, a cab driver, stated that on 12-10 the victim entered his vehicle at 5th and Hill Street and requested transportation to the Wally Johnson Hotel. On the way, the victim saw a car driving ahead, asked him to approach it and read the license plate number. Bousfield complied and read the plate number (QCM837) approximately six times while the victim copied it. A short distance from the motel, the two occupants turned and looked at his cab twice. Their car slowed, but did not stop. He observed that defendant Hammons was driving; Hammons also appeared "very mad." Bousfield discharged the victim who immediately went to a pay phone and made a telephone call. Afterwards, he left to pick up another fare. Bousfield indicated that his contact with the victim occurred at approximately 11:20 p.m.

Glen Newman, a security guard, stated that he was driving south on North Hill Street at approximately 11:30 p.m. A car traveling ahead slowed as it approached the Wally Johnson Motel. The car pulled near a curb where someone was talking at a pay phone. Next Newman heard a very loud pop and saw the individual at the phone fall. The car at the curb raced away, went through a red light and drove south on I-5. He attempted to catch the car or obtain the license plate number. However, he was unsuccessful, so he returned to the motel. He saw victim Santana lying on the ground; the pay phone receiver was dangling. Newman immediately called 911 and requested assistance. He remained at the scene until police arrived.

Finally, the police report indicated that officers questioned Michael Ross. Ross was the victim's boyfriend. They had been living together at the Wally Johnson Motel. Ross stated that the victim and another man were in their room around 8:30; they eventually left and the victim returned alone. He (the victim) came back later, smoked some crack, drank some beer and left again around 9:30 - 10:00 p.m. Ross next saw the victim through his motel window at approximately 11:30 p.m. He (the victim) was at a pay phone. Ross turned briefly from the window, then heard a gunshot. He saw the victim fall, and a dark blue car leave the scene. Ross ran outside and attempted to unsuccessfully revive his friend. He was unaware that the victim was having any problems.

During follow-up investigation, police determined that defendant Hammons was the registered owner of the vehicle reported by the defendant and Robert Bousfield. Officer further determined that he was a Marine stationed at Camp Pendleton. It appeared that he was interviewed twice at the base on 12-11-90. When initially questioned, he stated that he lived at Camp Pendleton. He also stated that he and the codefendant were together on 12-10-90. They drove another Marine to San Clemente, returned to Oceanside, went to the Main Attraction, a nightclub, then returned to his residence. Later, during another interview with three Oceanside detectives and an NIS officer, he admitted that he and the codefendant went to downtown Oceanside between 11 - 11:30 after leaving the Main Attraction. He was driving when the codefendant contacted the victim and solicited him for oral sex. The codefendant offered the victim $20. Then the codefendant exited the car and they went into an alley.

A short time later, the codefendant returned, he was agitated, and upset. He had the victim's glasses and jacket, and stated "the fucking bitch ripped me off." He got in the car and they drove down Hill Street. While driving, they saw the victim in a Taxi. The codefendant told him to turn around; they saw the victim again at a pay phone. Then Thornton told him to drive next to the phone. He complied and Thornton shot the victim once. Afterwards they drove on to I-5 South, turned around, went to Hammons' apartment and remained there for the rest of the night.

When questioned about the gun used by codefendant Thornton, Hammons stated he owned it. The weapon was a ?? Magnum, which he always carried in his car. The gun was registered to his father-in-law. However, it had been in his possession for the past five months. The gun was loaded and located on the front seat when he and the

HAMMONS, Jeffrey Todd
CRN 20484

4

1-3-92

codefendant approached the victim at the pay phone. He did not see Thornton pick up or aim the gun. Nor did he know that Thornton planned to shoot the victim. He thought that Thornton only wanted to get out of the car, get his money from the victim, then leave.

Defendant Hammons added that he and the codefendant eventually exited I-5, drove to a fast food market and returned to Oceanside. As they were traveling, Thornton became excited. He asked Hammons if he had more rounds. When Hammons answered affirmatively, he took the casing from the recently fired round, threw it out the window and put another round in. Hammons also stated he put a round in the gun. When they finally reached his apartment, he locked the gun in his closet.

At the termination of Hammons' interview, police obtained his permission to search his car and apartment. Among other things they found 76 .44 Magnum rounds, 18 .44 casings and a .44 Magnum revolver in his apartment. The gun and a shoulder holster were located inside his closet. The defendant's car was tested for gunshot residue. Results were negative, because it had apparently been cleaned recently.

After interviewing defendant Hammons, police then questioned defendant Thornton on 12-11 and 12-14-90. He confirmed that he and defendant Hammons drove to the Main Attraction on the night of 12-10. They both consumed four - seven beers and Hammons acted wildly and aggressively towards several women in the club. When they left the club between 9:00 30 p.m., Hammons stated that he wanted a "hooker". He drove around the area and began talking to one prostitute. However, she refused to engage in a transaction. Next, Hammons saw the victim, and negotiated to have sex for $18. They went into an alley. Approximately 15 - 20 minutes later, Hammons returned to his car. He stated that he was not able to "get off". He was angry and felt that the victim "ripped him off". He took the victim's glasses, entered his car and drove away. Defendant Thornton described the victim as "ugly and skaggedy". He further stated that he laughed while this incident occurred.

After leaving the alley, Hammons drove around the block, found the victim and confronted him again. When the victim demanded his glasses, Hammons agreed to return them after the job was finished. He got out of his car, began wrestling with the victim and took his jacket. Then he drove away. He began looking through the jacket pockets, but did not find any money, so he tossed the jacket on Thornton's lap. Thornton stated that he did not find any money either and he tossed the jacket out the car window.

Defendant Hammons continued driving. He was angry and stated that he was "going to scare the shit out" of the victim. He drove to his house, got his gun and returned to downtown Oceanside. During this time, defendant Thornton indicated that he was still laughing. He thought the situation was funny. He did not believe Hammons was going to shoot the victim. Once downtown, they saw the victim in a Taxi on Hill Street. Hammons parked his car by the curb in front of the phone booth at the Wally Johnson and waited for the victim to exit the taxi. Thornton stated that Hammons told him to roll down

the car window. Wwhen the victim walked to the phone, Hammons demanded his money from the victim, next Thornton heard a very loud shot. He saw the victim's leg fly in the air, then the victim lay on the ground. Thornton denied seeing Hammons use a gun or pull the trigger.

At that point, Hammons drove rapidly onto I-5 South. He picked up his gun, took out the casing and threw it out the window. A short time later, Hammons exited I-5 and turned north. On the way, they stopped at a 7/11. Defendant Thornton bought some soda and a sandwich for himself and some food for Hammons. They eventually returned to Hammons' apartment. Hammons placed the gun in his closet, then went to sleep. Thornton maintained that he was unable to sleep, and vomited during the night. The next morning, he and the codefendant got up, dressed and went to work.

Thornton indicated that he was "in shock" about the Instant Offense. He attempted to think of ways that he could inform the police anonymously because he was afraid the codefendant would retaliate. The police reported that defendant Thornton's statements contained several inconsistencies. It also commented that he became nervous and evasive when discussing the shooting.

Neither defendant was detained after their interviews in December. Both returned to active Marine Corps duty. When police investigation of the instant offense concluded, the defendants were arrested and taken to County Jail 5-22-91.

Contact with Defense Attorney David Rawson indicated additional information which emerged during defendant Hammons' jury trial. The jury was really undecided whether the defendant was the shooter. It was hung 6-6 on the allegation of use. However, it determined that the defendant was armed. The defendant was found guilty of aiding and abetting because he knew his gun was between the driver's and passenger's seats. A ballistics expert, presented by the defense, indicated it was possible that the passenger shot the victim. Further, the jury was transported to the scene of the Instant Offense. During a simulation of the crime, it appeared very difficult for the driver (the defendant) to see the victim's upper torso. Although the District Attorney's findings were consistent with the driver as the shooter, defense findings were also consistent with the passenger being the shooter.

Additional jury trial information was provided by Deputy District Attorney Jim Koeber. He indicated that the defendant called his gun "the Road Boss." The gun, a .44 Ruger revolver, had a 10.5 inch barrel. The defendant's wife testified that her father, who gave the gun to the defendant, also called it "Road Boss." Mark Cash, the Marine driven to Dana Point by the defendant, testified that he never saw this weapon in the defendant's car.

## VICTIMS:

RESTITUTION: Unknown

VICTIM NOTIFIED OF P&S HEARING: Yes     INTENDS TO APPEAR: Yes

SOURCES OF INFORMATION for this section

Telephone contact with defendant's sister, Mrs. Zaida Beattie - 12-23-91.

---

Mrs. Beattie stated that she was contacted by the Victim Witness Assistance Program. The program will provide funds for the victim's burial expenses. She also indicated that she suffered lost wages as a result of attending the defendant's hearings. However, the DA's office has indicated that they will reimburse her. To date she has not incurred any other expenses, therefore she is not submitting any request for restitution at this time.

Mrs. Beattie also stated that she will read a letter to the Court at the defendant's sentencing hearing. This letter contains her opinion regarding the defendant's disposition.


## DEFENDANT'S STATEMENT:

SOURCES OF INFORMATION for this section

Interview with defendant VDF 12-20-91.

---

Written Statement:

The defendant did not submit a written statement.

Interview:

Prior to the instant offense, the defendant stated that he had been at Twenty-nine Palms for ten days participating in field exercises. On 12-10, before leaving Twenty-nine Palms, Thornton approached him and asked for help finding an apartment. Thronton also asked if he could keep some of his things in the defendant's apartment. The defendant agreed. Later, Thornton asked if he wanted to go to the Main Attraction that evening with him and some friends. The defendant decided to go.

He and Thornton returned to Oceanside around 4:30. He gave another Marine a ride to Dana Point. Thornton also accompanied them. He and

Thornton returned to Oceanside. On the way to his apartment, they bought some food and a six-pack. When they arrived, they called their wives, dressed and drank the beer. The defendant consumed two cans, Thornton drank the rest. Afterwards, they went to Oceanside, got hair cuts and ate again, then they went to the Main Attraction. They got there between 8:30 - 9:30 p.m. Thornton's friends were already at the club. He and Thornton joined them and initially they sat at tables. Later they sat in front of the stage. Defendant Hammons stated that he was not as rowdy as reported. He and his companions were drinking and making comments. He and Thornton drank six beers each, however, the bouncer did not have to come over.

He and Thornton remained at the club for two - three hours. They left because Thornton was trying to avoid going to another club with his friends. When they left, the defendant denied making any comments about wanting to find a prostitute or getting sex. He and Thornton decided to drive to Oceanside pier. On the way, some girls (prostitutes) hollered at them. Thornton yelled back out of the window. As they reached Hill Street, Thornton told him to drive over to a prostitute (the victim). Thronton and the victim had a conversation about sex. The victim mentioned $20, then Thornton and the victim told him to drive down a side street.

Thronton got out of the car and went into an alley. He returned within five to ten minutes with a pair of glasses and jacket. He was angry and stated "the bitch ripped him off." The defendant thought the victim took his money, he did not see Thornton take the jacket. He must have grabbed the victim who then ran off, so Thornton was left holding the jacket (he did not know how Thornton obtained the glasses). Afterwards Thornton got back in the car and they drove down Hill Street. The defendant stated that they were going to ride in a circle and come back. Just before reaching the gas station on Hill Street Thornton threw the victim's jack and glasses out the car window.

As they were riding, Thornton was hollering "fucking bitch" and other shit like that. He was angry. Defendant Hammons stated he was drunk and laughing. He really did not think anything about the situation. They drove to the pier, turned around and traveled north on Hill Street. Suddenly Thornton tapped him on the shoulder and said "the fucking bitch is in the cab." The defendant turned, looked over his left shoulder and continued driving; He went south on Hill Street, past the Main Attraction. When they reached the Wally Johnson, Thornton started yelling that the victim was at the telephone. He told him (the defendant) to pull over. The defendant complied and started easing over, he wanted to make sure there was enough room at the curb. He looked over his shoulder because there was a vehicle behind him, he did not think he stopped completely.

While he was pulling over, a shot rang out. Thornton's back was turned away from him. Thornton shot the victim out of the passenger window as he (the defendant) looked over his shoulder. Thornton used the defendant's gun, it was positioned on the seat between them. The defendant put the gun in the car before they went out. He always carried it in his car.

HAMMONS, Jeffrey Todd  1-3-92
CRN 20484

After the shooting, Thornton told him to get the hell out of there. He took off fast and drove south on I-5. While riding on the highway, Thornton removed the empty casing from the gun and threw it out the passenger window. The defendant did not know why he did it. Thornton then asked for more rounds. There were some in the glove compartment. The defendant gave him one and he (Thornton) put it in the gun. A short time later, they exited I-5 to turn around. They went to a Circle-K to get something to drink. Thornton also got something to eat.

Next they returned to the defendant's house. He took the gun from Thornton, put it in his closet, locked it and went to sleep. Thornton also laid down. In the morning they went to work at 6:30 a.m. He kept telling Thornton they were in trouble, however, Thornton said they were "all right." He (Thornton) had done something similar before, i.e. once he and some cousins killed a hitch-hiker in northern California.

The undersigned questioned the defendant about prior knowledge of the codefendant's plans to kill the victim. He stated that he thought Thornton was going to fight the victim. He had no idea that Thornton was going to shoot. If he had known, he would not have driven to the curb. He also had no idea why Thornton shot the victim, he did not know Thornton well. This was the first time they had gone out together.

Defendant Hammons thought that he was guilty as an accessory after the fact because he did not contact the police the next day. He was afraid for his life so he did not call. However, he was not guilty of killing anyone. He felt very sad about the instant offense. He also felt sorry for the victim's family and his own family since they were still living. Most importantly, he was angry at Thornton because he lied and blamed him.

The defendant stated that he honestly did not know Thornton was going to shoot the victim. He did not think he should spend 16 years in prison for a crime he did not commit. He also believed he did not belong in jail. He expressed concern for his family, his wife must now support his children. Defendant Hammons indicated that he planned to file an appeal. Upon appeal, he expected to be exonerated of this crime.

CRIMINAL HISTORY:

SOURCES OF INFORMATION for this section

CII; FBI; NCIC; local record check 12-23-91.

It does not appear this defendant has any previous criminal history.

PERSONAL HISTORY

The following information was offered by the defendant. Unless noted otherwise it has not been verified.

Significant Family Information:
The defendant moved to Barbourville, Kentucky at age two, after his parents separated. He spent the remainder of his childhood and adolescence there until moving to Louisiana at age 17. After 18 months, he returned to Kentucky. He had been stationed at Camp Pendleton since 11-19-90.

Family Criminal History:
Denied

Education:
Defendant graduated from Knox County (Kentucky) High School in 1984.

Employment History:
Between 1984 - 1988, the defendant was employed part-time as a mechanic in the Louisiana and Kentucky National Guard. He was also self-employed as a mechanic. In the Marine Corps, he was employed as an infantry supervisory.

Source of Support:
The defendant earned $1,800 - $1,900 a month in the Marines.

Financial Condition:
Defendant indicated that he had a "little savings," but was not sure of a specific amount.

Number of Dependents & Ages/Relationship to Defendant:
Defendant has three children. A five-year-old daughter from a previous relationship, who lives with her mother in Kentucky. His two-year-old and five-month-old sons live with his wife in Texas.

Military Status:
Defendant joined the Marine Corps in February 1988. Prior to the instant offense, he was classified as a E-4. He anticipates an administrative discharge after sentencing.

Marital Status:
Defendant married Lisa Rene Buck in 1989. She was recently discharged from the Air Force, she is currently enrolled in a nursing program.

Psychological/Medical Problems:
Prior to the instant offense, the defendant did not report any problems. After incarceration for the instant offense, he became depressed and took sleeping medication for approximately three weeks.

Physical Health:
No problems reported or noted.

Substance Abuse History:
The defendant acknowledged experimentation with marijuana in high school. He last smoked it during 1983-1984. During high school, he also acknowledged drinking once a year. After joining the Marines, he drank a couple of beers or a short or two or liquor when he socialized with friends or on weekends when he and his wife entertained company.

Gang Affiliation:
Denies

Other:

SENTENCING DATA:

There will be no discussion of mitigants or aggravants. The defendant was convicted of a crime which requires imposition of an indeterminant term.

Prison Term Analysis:

Sentencing for Counts One requires imposition of a 15 year - life term. This term will run consecutive to the one year sentence for the 12022(a)(1) PC allegation.

EVALUATION:

Probation Eligibility:

Rule 413(a): Per 1203(e)(1) and 1204(e)(2), the defendant appears presumptively ineligible for probation. However, upon consideration of the defendant's lack of any prior record, the Court may wish to consider this case an unusual circumstance per Rule 408(a).

Circumstances Supporting a Grant of Probation:

Rule 414(b)(1): It appears that the defendant has no previous criminal history.

Rule 414(b)(4): The defendant is 25 years old, has completed 12 years of education and has served in the Marine Corps since 1988. His service record reflects participation in Desert Storm.

Rule 414(b)(6): The defendant maintains that imprisonment will adversely affect his wife and children.

Circumstances Supporting a Denial of Probation:

Rule 414(a)(1): The instant offense was extremely serious and resulted in the murder of Carlos Santana.

Rule 414(a)(2): The defendant was armed with a .44 Magnum revolver.

Rule 414(a)(4): The victim died as a result of the defendant's actions during the instant offense.

Rule 414(a)(6): The defendant appeared to be a very active participant in this crime.

Rule 414(a)(8): Given the defendant's extensive military training, possession of a .44 Magnum revolver and numerous rounds of ammunition, his actions appeared criminally sophisticated and professional.

Rule 414(b)(7): The defendant shows little remorse for his behavior.

Rule 414(b)(8): If not imprisoned, it is highly probably the defendant will remain a significant danger to community safety.

\* \* \*

This 25-year-old defendant appears for sentencing on Count One, 187(a) PC with a 12022.(a)(1) PC allegation. The police report described the instant offense as a drive-by shooting. It was not. This crime was a cruel, malicious execution by two individuals who were highly skilled in the art of war. They stalked the victim and followed him to an open, well lit area where he was an easy target. They opportunely positioned their vehicle to facilitate access to him at the phone booth. Then, the defendant shot and killed him with a very powerful weapon.

We believe the instant offense was a very sad, unnecessary waste of life. Throughout the police reports, it was quite striking that the defendants continually laughed at the victim. Carlos Santana was described as a "ugly and skaggedy" and he was treated very callously. It appeared that the defendants felt he had few rights. It certainly did not appear that they thought he had any right to live. Despite their statements of shock and dismay about the shooting, the

defendants appeared to treat his death as a very ordinary occurrence. After the Instant Offense, they ate, then slept. The next day they even went to work. Their actions appeared to indicate an assumption of privilege, power and control.

To date, the defendant shows very little remorse. He appears more concerned about minimizing his behavior and shifting culpability to the codefendant. We do not feel that he is an appropriate candidate for probation under any circumstances. Therefore, we recommend a denial of probation and commitment to State Prison for one year followed by a consecutive term of 15 - life.

## CUSTODY DATA:

At the time of sentencing, PC 1191.3 requires the Court to make an oral statement that statutory law permits the award of conduct and work-time credits up to one-third or one-half of the sentence that is imposed by the Court; that the award and calculation of credits is determined by the Sheriff in cases involving imprisonment in county jails; by the Department of Corrections in cases involving imprisonment in the state prison; and that credit for presentence incarceration served by the defendant is calculated by the Probation Department under current state law.

| Date Confined | Date Released | Place | Custody Days |
|---|---|---|---|
| 5-22-91 | 1-3-92 (In custody) | CJ | 227 |
|  |  | 4019 PC credit | 112 |
|  |  | Total CTS | 339 |

*Correction as of 1/21/92*

Actual — 244
4019 — 122
Total — 366 CTS