# EXHIBIT 4
# Part 1 of 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )     CDC Number H-23227
Hearing of:               )
                          )
JEFFREY HAMMONS           )
_____  )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 4, 2005

PANEL PRESENT:

SUSAN FISHER, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

JEFFREY HAMMONS, Inmate
MARY ANN TARDIFF, Attorney for Inmate
PHYLLIS SHESS, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No    See Review of Hearing
_____  Yes   Transcript Memorandum

**Connie Mastin**              **Peters Shorthand Reporting**

ii

INDEX

|                               | Page |
|-------------------------------|------|
| Proceedings                   | 1    |
| Case Factors                  | 7    |
| Pre-Commitment Factors        | 16   |
| Post-Commitment Factors       | 23   |
| Parole Plans                  | 20   |
| Closing Statements            | 46   |
| Recess                        | 54   |
| Decision                      | 55   |
| Adjournment                   | 61   |
| Transcriber Certification     | 62   |

--oOo--

1

1      **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER FISHER:**   All right.

3      Okay.   This is going to be a Subsequent Parole

4      Consideration Hearing for Jeffrey Hammons, CDC

5      number H-23227.   Today's date is 10/4/05.   And

6      we're located at the Correctional Training

7      Facility.   The inmate was received on 1/30/92

8      from San Diego County.   The life term began on

9      1/30/92.   And the minimum eligible parole date

10     is 4/20/92.   The controlling offense, which the

11     inmate has been committed, is second-degree

12     murder, case number CRM20484, count one.   Penal

13     Code section 187.   There was an additional

14     finding of use of a firearm.   That's Penal Code

15     section 12022(a).   The inmate received a term of

16     16 years to life.   Once again, the minimum

17     eligible parole date is 4/21/02.   And,

18     Mr. Hammons, we're tape-recording today.

19         **INMATE HAMMONS:**   Yes, Ma'am.

20         **PRESIDING COMMISSIONER FISHER:**   So for the

21     purpose of voice identification we're each going

22     to say our first and last name, and spell our

23     last name.   When I get to you I need your CDC

24     number too.   Okay.   I'm going to start with

25     myself and go to my right.   Susan Fisher,

26     F-I-S-H-E-R, Commissioner.

27         **DEPUTY COMMISSIONER MEJIA:**   Rolando Mejia,

1    Deputy Commissioner, M-E-J-I-A.

2        **DEPUTY DISTRICT ATTORNEY SHESS:**  Phyllis

3    Shess, Deputy District Attorney, San Diego

4    County, S-H-E-S-S.

5        **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

6    T-A-R-D-I-F-F, attorney for Mr. Hammons.

7        **INMATE HAMMONS:**  Jeffrey Hammons,

8    H-A-M-M-O-N-S.

9        **PRESIDING COMMISSIONER FISHER:**  And your CDC

10   number.

11       **INMATE HAMMONS:**  H-23227.

12       **PRESIDING COMMISSIONER FISHER:**  Okay.  Thank

13   you.  I'm going to note for the record that we

14   have two correctional officers present also who

15   are here for security purposes and will not be

16   participating in the hearing.  And, Ms. Tardiff,

17   do you know if Mr. Hammons has any ADA issues

18   that we need to accommodate?

19       **ATTORNEY TARDIFF:**  I do not.

20       **PRESIDING COMMISSIONER FISHER:**  Okay.  Are

21   you familiar with the Americans with

22   Disabilities Act?

23       **INMATE HAMMONS:**  Yes, Ma'am.

24       **PRESIDING COMMISSIONER FISHER:**  Have you

25   (indiscernible) in the past?

26       **INMATE HAMMONS:**  Yes.

27       **PRESIDING COMMISSIONER FISHER:**  Okay.  You

1    signed a BPT 1073 Form on July 9, of '04 and

2    said that you have no disabilities, is that

3    correct?

4        **INMATE HAMMONS:**  Yes, Ma'am.

5        **PRESIDING COMMISSIONER FISHER:**  Okay.  Let

6    me just ask you a couple of quick questions.  Do

7    you normally need to read -- to wear glasses?

8        **INMATE HAMMONS:**  No.

9        **PRESIDING COMMISSIONER FISHER:**  Okay.  Any

10   hearing problems?

11       **INMATE HAMMONS:**  No.

12       **PRESIDING COMMISSIONER FISHER:**  Okay.  Ever

13   been included in Triple CMS or EOP?

14       **INMATE HAMMONS:**  No.

15       **PRESIDING COMMISSIONER FISHER:**  And how far

16   did you get in school before you came here?

17       **INMATE HAMMONS:**  Finished the twelfth grade.

18       **PRESIDING COMMISSIONER FISHER:**  Okay.  Good.

19   All right.  This hearing is being conducted

20   pursuant to Penal Code section 3041 and 3042 and

21   the rules and regulations of the Board of Prison

22   Terms that govern parole consideration hearings

23   for life inmates.  And as you know, the purpose

24   of the hearing today is to consider your

25   commitment offense --

26       **INMATE HAMMONS:**  Yeah.

27       **PRESIDING COMMISSIONER FISHER:**  -- your

4

1    prior criminal and social history, and your

2    behavior and programming since you've been in

3    prison for this offense.  We've had the

4    opportunity to review your files.  We're going

5    to give you the opportunity to make any

6    corrections that you need to today.  All right.

7        **INMATE HAMMONS:**  Okay.

8        **PRESIDING COMMISSIONER FISHER:**  We're going

9    to reach a decision today as to whether or not

10   we find you suitable for parole.  And if we do

11   find you suitable today I'll explain to you how

12   much longer you'll be in prison.

13       **INMATE HAMMONS:**  Okay.

14       **PRESIDING COMMISSIONER FISHER:**  All right.

15   Before we recess to deliberate I'm going to give

16   you and Ms. Tardiff, as well as Ms. Shess, all

17   an opportunity to make a final statement about

18   your suitability.  I want to remind you that

19   you're not required to admit or discuss the

20   offense today, but that the Panel accepts the

21   findings of the court to be true.

22       **INMATE HAMMONS:**  Yes.

23       **PRESIDING COMMISSIONER FISHER:**  Do you

24   understand that?  Okay.  The California Code of

25   Regulations states that regardless of time

26   served a life inmate shall be found unsuitable

27   for and denied parole if in the judgment of the

1    Panel he would pose an unreasonable risk of

2    danger to society if released from prison.  You

3    have rights that are related to your hearing.

4    They include the right to a timely notice of the

5    hearing, the right to review your Central File,

6    and the right to present relevant documents.

7        **INMATE HAMMONS:**  Yes.

8        **PRESIDING COMMISSIONER FISHER:**  Counsel,

9    have your client's rights been met?

10       **ATTORNEY TARDIFF:**  Yes.

11       **PRESIDING COMMISSIONER FISHER:**  You also

12   have the right, Mr. Hammons, to an impartial

13   Panel.  Now that you've seen your two Panel

14   members, do you have any objections to your

15   Panel?

16       **INMATE HAMMONS:**  No.

17       **PRESIDING COMMISSIONER FISHER:**  Counsel?

18       **ATTORNEY TARDIFF:**  No.

19       **PRESIDING COMMISSIONER FISHER:**  Okay.  I'm

20   going to give you a copy of our decision today.

21   It's going to be a tentative decision, and it

22   will be effective within 120 days.  And then a

23   copy of the decision and a copy of the

24   transcript of the hearing is going to be sent to

25   you.

26       **INMATE HAMMONS:**  Yes.

27       **PRESIDING COMMISSIONER FISHER:**  Now, they

1    changed the way that you appeal Board decisions

2    last year.  Are you familiar with the changes?

3         **INMATE HAMMONS:**  No.

4         **PRESIDING COMMISSIONER FISHER:**  Okay.  Prior

5    to (indiscernible) -- Prior to May of last year

6    all appeals of Board decisions went to the Board

7    on the 1040 Form.  After that, they changed it

8    so that now all appeals go directly to the

9    courts.  I'm just so easily distracted.  That's

10   terrible.

11        **ATTORNEY TARDIFF:**  It doesn't take much.

12        **PRESIDING COMMISSIONER FISHER:**  It really

13   does seem to, does it?  Thank you.  All right.

14   Is there anything that needs to be submitted?

15        **ATTORNEY TARDIFF:**  No.

16        **PRESIDING COMMISSIONER FISHER:**  Any

17   preliminary objections?

18        **ATTORNEY TARDIFF:**  No.

19        **PRESIDING COMMISSIONER FISHER:**  Okay.  Will

20   Mr. Hammons going to be speaking with us?

21        **ATTORNEY TARDIFF:**  Yes.

22        **PRESIDING COMMISSIONER FISHER:**  Mr. Hammons,

23   if you'll raise your right hand.  I'm going to

24   swear you in.  Do you solemnly swear or affirm

25   that the testimony you give at this hearing will

26   be the truth and nothing but the truth?

27        **INMATE HAMMONS:**  Yes.

7

1      **PRESIDING COMMISSIONER FISHER:**  Thank you.

2      **DEPUTY COMMISSIONER MEJIA:**  There's no

3  confidential.

4      **PRESIDING COMMISSIONER FISHER:**  Thank you.

5  I appreciate that.  All right.  All right.

6  Counsel, I'm going to use the October 2004

7  calendar of the Board report if you have no

8  objections.

9      **ATTORNEY TARDIFF:**  No.

10      **PRESIDING COMMISSIONER FISHER:**  Okay.  What

11  I'm going to do, Mr. Hammons, is read a summary

12  of the crime into the record, and then I'm just

13  going to have you tell me if you agree with it.

14      **INMATE HAMMONS:**  Yes.

15      **PRESIDING COMMISSIONER FISHER:**  Anything

16  that you don't agree with, or anything that you

17  feel like we need to elaborate on, we'll just go

18  from there.  All right.  Under summary of the

19  crime it reads:

20          "On the night of 12/10/90 Victim

21          Carlos Santana telephoned the

22          Oceanside Police twice.  After the

23          first call an officer met him at

24          the Oceanside (Indiscernible)

25          Center where he reported leaving

26          his jacket in the car occupied by

27          two Marines.  The jacket contained

1              his glasses and $26.  Victim

2              Santana, a prostitute, stated that

3              he did not want to make a formal

4              report or cause trouble since it

5              was Christmas.  He requested that

6              his goods be returned if the

7              Marines were located, and provided

8              the description and license plate

9              of the car.  At the end of the

10             contact he stated that

11             (indiscernible) in front of the

12             Travel Lodge, 1402 North Hill

13             Street.  Approximately 15 minutes

14             later police received another call

15             from Victim Santana.  He stated

16             that he was in front on the Wally

17             Johnson Motel --"

18     I think it's supposed to be of the Wally Johnson

19     Motel.

20             "-- watching the car he identified

21             earlier.  He provided the vehicle

22             license plate number, in

23             parenthesis, QCM837.  I request

24             police assistance.  The dispatcher

25             put him on hold, then attempted to

26             direct the police unit to his

27             location.  A short time later

```
 1          police received several emergency
 2          calls stating that the victim had
 3          been shot.  Officers responding to
 4          these reports found him lying on
 5          the sidewalk in front of Wally
 6          Johnson Motel.  They determined
 7          that he had been mortally wounded
 8          from a gunshot to the upper torso.
 9          He was pronounced dead at the
10          scene, in parenthesis, 11:50 p.m.,
11          then transported directly to the
12          medical examiner's officer.  An
13          autopsy was subsequently performed.
14          Autopsy results indicated that he
15          died of a gunshot wound to the neck
16          and chest.  The prisoner, Jeffrey
17          Hammons, and Todd Alan Thornton,
18          that's T-H-O-R-N-T-O-N, Alan is A-
19          L-A-N, were arrested and charged
20          with the murder.  Both Hammons and
21          Thornton gave accounts of the
22          incident that were contradictory,
23          each implicating (indiscernible)
24          the shooter.  Hammons was convicted
25          by a jury trial on 12/4/91.  The
26          codefendant, Thornton, pled guilty
27          to 192(a), voluntary manslaughter."
```

10

1  And it notes the probation officer's report is

2  the source of this information.  Okay.  All

3  right.  Mr. Hammons, is that correct?

4    **INMATE HAMMONS:**  Yes.

5    **PRESIDING COMMISSIONER FISHER:**  Is there

6  anything about that needs to be --

7    **INMATE HAMMONS:**  No.

8    **PRESIDING COMMISSIONER FISHER:**  Okay.  Now,

9  were you -- You were stationed at Camp Pendleton

10  at the time, right?

11    **INMATE HAMMONS:**  Yes.

12    **PRESIDING COMMISSIONER FISHER:**  You were a

13  Marine?

14    **INMATE HAMMONS:**  Yes.

15    **PRESIDING COMMISSIONER FISHER:**  Okay.

16    **INMATE HAMMONS:**  Yes.

17    **PRESIDING COMMISSIONER FISHER:**  How did you

18  get involved with this victim?

19    **INMATE HAMMONS:**  Approached the victim for

20  oral sex.  That's how I met the victim.

21    **PRESIDING COMMISSIONER FISHER:**  Okay.  And

22  Mr. Santana at the time, he was dressed as a

23  woman, is that correct?

24    **INMATE HAMMONS:**  Yes.

25    **PRESIDING COMMISSIONER FISHER:**  Okay.  So

26  what happened?  How did this all -- How did

27  things evolve during the course of the --

11

1    **INMATE HAMMONS:**  Excuse me?  Say that again.

2    **PRESIDING COMMISSIONER FISHER:**  How this all

3    evolve?  How did he end up -- How did he end up

4    dead?

5    **INMATE HAMMONS:**  Well, I met Mr. Santana

6    thinking that it was a female prostitution -- or

7    prostitute.  I was going to receive oral sex for

8    $20 and stuff.  And upon starting the act I

9    discovered that Mr. Santana was a Mr. Santana

10   instead of a Mrs. Santana.  And I got upset,

11   grabbed the person's -- I was going to beat him

12   up.  I grabbed a hold of his jacket.  He ran out

13   of his jacket.  He takes off.  I don't know

14   where he went.  Came back, got in a car, throw

15   the jacket to Mr. Thornton, left, went down to

16   the road.  I guess it's the main street.  Then I

17   guess about 15 minutes later Mr. Thornton tapped

18   me on my shoulder and said that Mr. Santana, or

19   the prostitute, I didn't know the person's name

20   at the time --

21   **PRESIDING COMMISSIONER FISHER:**  Right.

22   **INMATE HAMMONS:**  -- was behind us in a

23   taxicab.  So I went down to the filling station,

24   turned around, and turned around, and

25   Mr. Santana got out of the taxicab.  He was in

26   front of Wally Johnson's Motel.  I pulled up and

27   told Mr. Thornton to roll down the window.

12

1    Mr. Thornton rolled down the window.  I had a

2    .44 pistol laying on the console.  I picked the

3    pistol up, cocked it, leaned over and aimed it

4    and shot.

5        **PRESIDING COMMISSIONER FISHER:**  Okay.  So he

6    wasn't -- First of all, let me back up.  Let me

7    (indiscernible).  You were driving?

8        **INMATE HAMMONS:**  Yes.

9        **PRESIDING COMMISSIONER FISHER:**  Okay.  So

10   you -- Say this is the driver's side window.

11   You pointed out this window over here?

12       **INMATE HAMMONS:**  Yes, passenger side.

13       **PRESIDING COMMISSIONER FISHER:**

14   (Indiscernible) on the other side of the street?

15       **INMATE HAMMONS:**  Yes.

16       **PRESIDING COMMISSIONER FISHER:**  All right.

17   So he wasn't following you in the taxicab?  He

18   was just going --

19       **INMATE HAMMONS:**  Yes.  I have no idea what

20   he was doing and stuff.

21       **PRESIDING COMMISSIONER FISHER:**  Okay.  All

22   right.  I'm just trying to figure out how it all

23   came about.  All right.  And did you know right

24   away that you hit him?

25       **INMATE HAMMONS:**  Yes.

26       **PRESIDING COMMISSIONER FISHER:**  Okay.  Was

27   that your intention?

13

1      **INMATE HAMMONS:**  No.  I don't know what my

2   intention was that night and stuff.  I didn't

3   tell myself I'm going to shoot this person or

4   whatever.  I told him -- I remember saying

5   something to Mr. Thornton, I'm going to scare

6   this person and stuff.  And I think my exact

7   words is I'm going to scare the shit out of him

8   and stuff.  Then the gun went off.

9      **PRESIDING COMMISSIONER FISHER:**  Then the gun

10  went off?

11     **INMATE HAMMONS:**  Yes.

12     **PRESIDING COMMISSIONER FISHER:**  Okay.  You

13  were holding with --

14     **INMATE HAMMONS:**  Yes, yes.

15     **PRESIDING COMMISSIONER FISHER:**  --

16  (indiscernible).

17     **INMATE HAMMONS:**  Yes.  I pulled the trigger.

18     **PRESIDING COMMISSIONER FISHER:**  Okay.

19     **INMATE HAMMONS:**  Yes.  I pulled the trigger.

20     **PRESIDING COMMISSIONER FISHER:**  I always

21  hate it when the people say the gun went off.

22     **INMATE HAMMONS:**  Yeah, yeah.  My trigger had

23  a -- My finger had to make the trigger go off.

24     **PRESIDING COMMISSIONER FISHER:**  Exactly.

25     **INMATE HAMMONS:**  Yes.

26     **PRESIDING COMMISSIONER FISHER:**  All right.

27  Did you ever stop to think you might have hit

14

1    the cab driver?

2        **INMATE HAMMONS:**  The cab driver wasn't even

3    there.

4        **PRESIDING COMMISSIONER FISHER:**  He wasn't?

5        **INMATE HAMMONS:**  No.

6        **PRESIDING COMMISSIONER FISHER:**  At the

7    time --

8        **INMATE HAMMONS:**  The cab driver let the

9    victim out -- let the victim out, Mr. Santana

10   out.  When I pulled up to the side of the curb

11   and stopped and stuff, Mr. Santana was on the

12   telephone --

13       **PRESIDING COMMISSIONER FISHER:**  Okay.

14       **INMATE HAMMONS:**  -- talking to the police

15   department.

16       **PRESIDING COMMISSIONER FISHER:**  The cab was

17   already gone.

18       **INMATE HAMMONS:**  Yes, yes.  The cab was

19   already gone.

20       **PRESIDING COMMISSIONER FISHER:**  All right.

21   Okay.  After you shot, did you see him?  Did he

22   fall?

23       **INMATE HAMMONS:**  Yes.  After I shot I seen

24   the person fall.  I got in a car and I left.

25       **PRESIDING COMMISSIONER FISHER:**  Okay.  Okay.

26       **INMATE HAMMONS:**  I was in the car.  I put

27   the car in drive and drove off.

15

1    **PRESIDING COMMISSIONER FISHER:**   Okay.   Had

2   you been drinking that night?

3    **INMATE HAMMONS:**   Yes.

4    **PRESIDING COMMISSIONER FISHER:**   Would you

5   say that at the time you had been drunk?

6    **INMATE HAMMONS:**   Yes.

7    **PRESIDING COMMISSIONER FISHER:**   Okay.   All

8   right.   Now, what happened later?   How did you

9   get arrested?

10    **INMATE HAMMONS:**   It was the next morning.   I

11   was on the base at Camp Pendleton.

12   Investigators came to my unit and asked me if

13   they could ask me a few questions.   It started

14   from there.

15    **PRESIDING COMMISSIONER FISHER:**   Okay.   All

16   right.   And did you admit to it right away?

17    **INMATE HAMMONS:**   No.   No, I did not.

18    **PRESIDING COMMISSIONER FISHER:**   Okay.

19    **INMATE HAMMONS:**   No.

20    **PRESIDING COMMISSIONER FISHER:**   How long did

21   it take before you admitted to what you did?

22    **INMATE HAMMONS:**   How long did it take to

23   admit?

24    **PRESIDING COMMISSIONER FISHER:**   Uh-hmm.

25    **INMATE HAMMONS:**   I think a couple of years

26   in prison and stuff.

27    **PRESIDING COMMISSIONER FISHER:**   All right.

16

1    Is there anything else about what happened that

2    night that we haven't talked about that you

3    think is important for us to know?

4        **INMATE HAMMONS:**  At the time when I found

5    out it was a man and stuff, that really bothered

6    me and stuff.  But, no.

7        **PRESIDING COMMISSIONER FISHER:**  Okay.  All

8    right.  Let's talk about your social history,

9    and then we'll talk about your parole plans.

10   According to the information I have you have no

11   prior criminal record, is that correct?

12       **INMATE HAMMONS:**  Yes.

13       **PRESIDING COMMISSIONER FISHER:**  Okay.  The

14   information that I have here about your social

15   history is that -- Let's see, let's start back

16   here.  Okay.  It doesn't tell me what I'm

17   looking for.  Where were you born?

18       **INMATE HAMMONS:**  I was born in Dallas,

19   Texas.

20       **PRESIDING COMMISSIONER FISHER:**  And were you

21   there until you (indiscernible)?

22       **INMATE HAMMONS:**  No, I was there until I was

23   about two years of age.  Then I moved to the

24   State of Kentucky, and I was raised up in the

25   State of Kentucky until I was 17.  Then when I

26   was 17 I joined Army National Guards.  Then a

27   few years later I joined the Marine Corps.

1    **PRESIDING COMMISSIONER FISHER:**  Okay.

2    (Indiscernible) a little bit about

3    (indiscernible).

4    **INMATE HAMMONS:**  Yes.

5    **PRESIDING COMMISSIONER FISHER:**  I was

6    wondering where you were -- where you were from

7    originally.  Were you raised by both parents?

8    **INMATE HAMMONS:**  No, single parent, my

9    mother.

10    **PRESIDING COMMISSIONER FISHER:**  Okay.  And

11    what about brothers and sisters?

12    **INMATE HAMMONS:**  Yes.

13    **PRESIDING COMMISSIONER FISHER:**  How many?

14    **INMATE HAMMONS:**  Two brothers, two sisters.

15    **PRESIDING COMMISSIONER FISHER:**  Okay.  Are

16    you still in contact with them?

17    **INMATE HAMMONS:**  Yes.

18    **PRESIDING COMMISSIONER FISHER:**  Okay.

19    **INMATE HAMMONS:**  Yes.

20    **PRESIDING COMMISSIONER FISHER:**  Is your mom

21    still alive?

22    **INMATE HAMMONS:**  Yes.

23    **PRESIDING COMMISSIONER FISHER:**  Okay.

24    **INMATE HAMMONS:**  Yes.

25    **PRESIDING COMMISSIONER FISHER:**  And you're

26    still in contact with her?

27    **INMATE HAMMONS:**  Yes.

18

1    **PRESIDING COMMISSIONER FISHER:**  Okay.  Let's

2    see here, I noticed you -- Let's see, you

3    graduated from high school, right?

4    **INMATE HAMMONS:**  Yes.

5    **PRESIDING COMMISSIONER FISHER:**  Okay.  And

6    then how long were you in the National Guard?

7    **INMATE HAMMONS:**  I guess about two and a

8    half years.

9    **PRESIDING COMMISSIONER FISHER:**  And you have

10   -- In the Marine Corps you were in Desert Storm,

11   is that right?

12   **INMATE HAMMONS:**  Yes, Ma'am.

13   **PRESIDING COMMISSIONER FISHER:**  It says here

14   that you have been married once.

15   **INMATE HAMMONS:**  Yes.

16   **PRESIDING COMMISSIONER FISHER:**  And that you

17   were divorced in 1996, is that right?

18   **INMATE HAMMONS:**  Yes.

19   **PRESIDING COMMISSIONER FISHER:**  Okay.  Any

20   children?

21   **INMATE HAMMONS:**  Yes.

22   **PRESIDING COMMISSIONER FISHER:**  How many?

23   **INMATE HAMMONS:**  Three.

24   **PRESIDING COMMISSIONER FISHER:**  How old?

25   **INMATE HAMMONS:**  My daughter is 18, and my

26   two sons is 16 and 14.

27   **PRESIDING COMMISSIONER FISHER:**  Okay.  And

1    how are they doing?

2        INMATE HAMMONS:  Doing good.

3        PRESIDING COMMISSIONER FISHER:  Good.  All

4    right.  And what about your wife, are you still

5    in regular contact with your ex-wife?

6        INMATE HAMMONS:  Not that much.

7        PRESIDING COMMISSIONER FISHER:  Okay.  Just

8    in relation to the kids?

9        INMATE HAMMONS:  Yes.  I'm in contact with

10   my kids.

11       PRESIDING COMMISSIONER FISHER:  Okay.  How

12   is your relationship with them?

13       INMATE HAMMONS:  Good.

14       PRESIDING COMMISSIONER FISHER:  Okay.  Let's

15   see here, most of your work history is related

16   to your military, isn't it?

17       INMATE HAMMONS:  Yes.  When I was a teenager

18   I worked in a garage and stuff, mechanic work.

19       PRESIDING COMMISSIONER FISHER:  Okay.  All

20   right.  Tell me about your substance abuse

21   history.  It says that you have -- It looks like

22   it's mostly alcohol.

23       INMATE HAMMONS:  Yes.

24       PRESIDING COMMISSIONER FISHER:  Is that

25   right?

26       INMATE HAMMONS:  Yes.

27       PRESIDING COMMISSIONER FISHER:  How old were

20

1    you when you started drinking?

2        **INMATE HAMMONS:**  I guess I was a teenager,

3    probably experimenting a little bit in high and

4    stuff.  But the majority of my drinking started

5    when I joined the military and stuff.

6        **PRESIDING COMMISSIONER FISHER:**  That was

7    mostly weekend stuff?

8        **INMATE HAMMONS:**  Weekends, different

9    deployments, after we come back from different

10   deployments and stuff.

11       **PRESIDING COMMISSIONER FISHER:**  Okay.  Okay.

12   It says that you've had some blackouts in the

13   past.

14       **INMATE HAMMONS:**  Yes.

15       **PRESIDING COMMISSIONER FISHER:**  Okay.  All

16   right.  Anything else about your life before

17   coming to prison for this offense that you and I

18   haven't talked about that you think would be

19   important for us to know?

20       **INMATE HAMMONS:**  No.

21       **PRESIDING COMMISSIONER FISHER:**  All righty.

22   Let's see what we've got here.  Under future

23   plans, we're going into your parole plans, it

24   says that you would hope to be able to go back

25   to Kentucky.

26       **INMATE HAMMONS:**  Yes.

27       **PRESIDING COMMISSIONER FISHER:**  Okay.  It

21

1    says you have several family members living

2    there who could provide a place to live.  And it

3    says that you would initially work with your

4    brother-in-law at his garage, is that right?

5        INMATE HAMMONS:  Yes.

6        PRESIDING COMMISSIONER FISHER:  Okay.  And

7    do I -- I didn't see any letters here.  Do we

8    have any letters of support that I missed?  I

9    don't think I do.  It says in here that you were

10   going to try to get some letters from family

11   members.

12       INMATE HAMMONS:  Yes.

13       PRESIDING COMMISSIONER FISHER:  Did you do

14   that?

15       INMATE HAMMONS:  I have a few that's in my

16   property.

17       PRESIDING COMMISSIONER FISHER:  Okay.  But

18   you didn't give them to your --

19       INMATE HAMMONS:  No.

20       PRESIDING COMMISSIONER FISHER:  --

21   counselor?

22       INMATE HAMMONS:  No.

23       PRESIDING COMMISSIONER FISHER:  Okay.  Now,

24   what about, you know, you can't necessarily

25   parole out like out to Kentucky.  So what would

26   you do if --

27       INMATE HAMMONS:  I wrote some places out

1   here and stuff, for San Diego and stuff.  And

2   Salvation Army has a program, a live in place.

3   I think it's for a year or two years.

4       **PRESIDING COMMISSIONER FISHER:**  Okay.

5       **INMATE HAMMONS:**  And stuff for that.  But

6   also my family would financially support me and

7   to get me an apartment, buying a used car to

8   help me on my feet until I get a job --

9       **PRESIDING COMMISSIONER FISHER:**  Okay.

10      **INMATE HAMMONS:**  -- and stuff.

11      **PRESIDING COMMISSIONER FISHER:**  All right.

12   Whether you get a parole date today or not it's

13   important for you to start generating some of

14   those letters and start getting them into your

15   file.  Okay.  That will be something that once

16   you get a parole date investigations will follow

17   up on it.  But it's always good to have

18   something so that the Commissioners can see what

19   you're planning, and that you have -- that you

20   have the same (indiscernible) --

21      **INMATE HAMMONS:**  Yes.

22      **PRESIDING COMMISSIONER FISHER:**  -- that you

23   would have.  So that's something that you should

24   think about doing.  If there's nothing else

25   about parole plans -- Well, let me ask you this,

26   are you planning on getting involved in

27   substance abusing programming while you're out

1    there --

2         **INMATE HAMMONS:**   Yes.

3         **PRESIDING COMMISSIONER FISHER:**   -- on the

4    street?

5         **INMATE HAMMONS:**   Yes.

6         **PRESIDING COMMISSIONER FISHER:**   Okay.

7         **INMATE HAMMONS:**   Yes.

8         **PRESIDING COMMISSIONER FISHER:**   All right.

9    If there's nothing else, if you'll turn your

10   attention to Commissioner Mejia, he's going to

11   go through your institutional programming with

12   you.

13        **DEPUTY COMMISSIONER MEJIA:**   Okay.

14   Mr. Hammons, I'll be covering your institutional

15   adjustment in this portion of the hearing since

16   your last Board appearance.

17        **INMATE HAMMONS:**   Yes.

18        **DEPUTY COMMISSIONER MEJIA:**   I have reviewed

19   your file (indiscernible).  And I'll be making a

20   presentation with you.  If I miss anything, or

21   you want to make additional comments for the

22   record, I will (indiscernible).  I'll give you

23   the opportunity during my presentation.  And

24   your last Board appearance was on January 25th,

25   2005.  However, they postponed because of a

26   (indiscernible).  Your (indiscernible)

27   appearance was on October 15th, 2001 wherein you

24

1    received a three-year denial.  And the

2    recommendations were for you to remain

3    disciplinary-free, upgrade vocationally, and

4    participate in self-help and therapy.  Your

5    classification score is 19.  Custody level is

6    medium A.  I guess I saw that you just finished

7    welding, vocational welding.

8         INMATE HAMMONS:  Yes, Sir.

9         DEPUTY COMMISSIONER MEJIA:  In July 2005.

10   And what is your most current assignment right

11   now?

12        INMATE HAMMONS:  I'm unassigned right now.

13        DEPUTY COMMISSIONER MEJIA:  (Indiscernible).

14        INMATE HAMMONS:  I was just moved from --

15   Yes.

16        DEPUTY COMMISSIONER MEJIA:  And you have

17   a -- You graduated high school in 1984, 7.8 GPL.

18   Vocational history, I counted three now, one

19   vocational mechanical drafting in 1997, and one

20   vocational machine shop in 2001.  The most

21   recent is vocational welding.

22        INMATE HAMMONS:  Yes, Sir.

23        DEPUTY COMMISSIONER MEJIA:  Have you taken

24   your certification yet?

25        INMATE HAMMONS:  Yes, AWS certification,

26   yes.

27        DEPUTY COMMISSIONER MEJIA:  Are you

25

1    certified now?

2        **INMATE HAMMONS:**  Yes.

3        **DEPUTY COMMISSIONER MEJIA:**  Okay.  Good.

4    And self-help group that you've attended, I've

5    noted that you've been attending AA since 1995.

6    I see current participation up to date.

7    (Indiscernible) 2004 of December.  Are you still

8    attending AA?

9        **INMATE HAMMONS:**  Yes.

10       **DEPUTY COMMISSIONER MEJIA:**  Okay.  And I

11   would suggest that you give, you know, updated

12   chronos of your file.

13       **INMATE HAMMONS:**  Yes.

14       **DEPUTY COMMISSIONER MEJIA:**  So that it would

15   look like you're still attending.  I'm sure you

16   are.  But you have impact 2000, but you're

17   basically playing football.

18       **INMATE HAMMONS:**  Yes.

19       **DEPUTY COMMISSIONER MEJIA:**  That's sports.

20   And I'm looking at the -- Have you taken the

21   anger management?

22       **INMATE HAMMONS:**  No, I have not.  I've never

23   taken anger management.

24       **DEPUTY COMMISSIONER MEJIA:**  Okay.  I'm

25   looking at the -- I know you -- Do you know your

26   12 Steps --

27       **INMATE HAMMONS:**  Yes.

26

1    **DEPUTY COMMISSIONER MEJIA:**   -- from AA?

2    **INMATE HAMMONS:**   Yes.

3    **DEPUTY COMMISSIONER MEJIA:**   Okay.   And

4    impact is somewhat close to something you can

5    get, but I would suggest you get the anger

6    management programs.

7    **INMATE HAMMONS:**   Yes.

8    **DEPUTY COMMISSIONER MEJIA:**   You can read

9    books.

10    **INMATE HAMMONS:**   Yes, Sir.

11    **DEPUTY COMMISSIONER MEJIA:**   (Indiscernible)

12    books and --

13    **INMATE HAMMONS:**   Yes.

14    **DEPUTY COMMISSIONER MEJIA:**   --

15    (indiscernible), and put it down on paper, and

16    send it to us.   Have them put it in the file.

17    You have also -- Yeah, AA is good.   Impact is

18    good.   I think additionally you need to go on AA

19    -- anger management.   No gang affiliation was

20    noted.

21    **INMATE HAMMONS:**   No, Sir.

22    **DEPUTY COMMISSIONER MEJIA:**   And you have two

23    115s in '97 and 1999.   They're both for mutual

24    combat.

25    **INMATE HAMMONS:**   Yes, Sir.

26    **DEPUTY COMMISSIONER MEJIA:**   And that's one

27    issue that you have too.   It's only six years

1   ago that you haven't had any (indiscernible) or

2   violence.

3       **INMATE HAMMONS:**  Yes.

4       **DEPUTY COMMISSIONER MEJIA:**  So think about

5   it.  Okay.  And I will look at your psychiatric

6   report.  Have I missed anything when it comes to

7   your self-help --

8       **INMATE HAMMONS:**  No, Sir.

9       **DEPUTY COMMISSIONER MEJIA:**   --

10  participation?  April 29, 2005 is the date of

11  the report by Dr. -- two words -- it's two

12  words, spelled as S-T as in Tom E-W-A-R-D as in

13  David.  The diagnostic impression is currently

14  Axis I, Alcohol Abuse in full remission.   Axis

15  II no contributory personality disorder.   Axis

16  III no contributory physical disorder.

17  According to him, the psychologist, your

18  judgment and impulse control is very good at

19  that time.

20          "Both prior reports indicate that

21          the inmate have adult antisocial

22          personality traits.  There does not

23          appear to be evidence -- to be

24          evidence for a personality

25          disorder.  In view of the life

26          crime (indiscernible) responsible

27          for the victim's death.  In

28

```
 1          retrospect, he realizes he used

 2          very poor judgment while drug and

 3          enraged.  He does not think the

 4          crime would have happened if he did

 5          not have (indiscernible) in the

 6          car.  There are many ways to accept

 7          (indiscernible) and to do -- to

 8          even the (indiscernible).  Inmate

 9          Hammons is (indiscernible) without

10          any influence over Hammons' own

11          judgment and impulse control.  This

12          murder did not happen because of a

13          firearm.  It happened because of

14          Inmate Hammons' exercise -- Hammons

15          exercised very poor judgment and

16          had little impulse control when he

17          used alcohol.  But it is

18          (indiscernible) either that caused

19          (indiscernible).  It was Inmate

20          Hammons who made all the decisions.

21          Inmate Hammons is blaming the

22          firearm on the (indiscernible)

23          object without any influence over

24          Hammons' own judgment and impulse

25          control.  This murder did not

26          happen because of the firearm.  It

27          happened because Inmate Hammons
```

29

1    exercised very poor judgment and

2    had little impulse control when he

3    used the alcohol.  But it's not

4    (indiscernible) of alcohol either

5    that caused this crime.  It was

6    Inmate Hammons who made all the

7    decisions.  Aside from this obvious

8    attempt to avoid responsibility and

9    (indiscernible) from guilt, Inmate

10   Hammons take responsibility for his

11   choice stating, quote, I should

12   have not been out cheating on my

13   wife.  I should have not been

14   drinking.  Unquote.  Inmate Hammons

15   also (indiscernible) in the prior

16   report that the alcohol reduced his

17   (indiscernible) ability.  Inmate

18   Hammons is truly remorseful for how

19   his actions have affected the

20   victim and the victim's family.

21   And he understands the

22   circumstances that led to the

23   offense.  Assessment of

24   dangerousness, Inmate Hammons'

25   violence potential within a

26   controlled setting is considered

27   below average relative to the

1   inmate population.  (Indiscernible)

2   and six years ago he received 115s

3   for mutual combat without serious

4   injury.  Despite this behavior, he

5   does not have a significant

6   juvenile criminal history, and no

7   history of gang involvement.  His

8   adult criminal history is limited

9   to the current offense.  Further,

10   Inmate Hammons understands and

11   agrees (indiscernible) attendance

12   at AA.  There was not any

13   significant psychopathology

14   observed during this interview that

15   would indicate he's a very serious

16   risk to the community.  If released

17   to the community Inmate Hammons

18   violence potential is considered to

19   be no more than the average

20   citizen.  Alcohol is the most

21   significant risk factor for Inmate

22   Hammons' violence.  But he realizes

23   he is truly an alcoholic and cannot

24   (indiscernible) at any time.  He

25   has successfully sustained from

26   alcohol beverages since his

27   incarceration, given the