# EXHIBIT 4
# Part 2 of 2

31

1       (indiscernible) this one incident

2       had upon his life.  It is very

3       unlikely he will ever allow himself

4       to drink again."

5    Any additions you want to make, or comments that

6    you want to make, with regards to my

7    presentation, counsel?

8       **ATTORNEY TARDIFF:**  Not at this time.

9       **DEPUTY COMMISSIONER MEJIA:**  Okay.  And let

10   me turn this back to the Chair.

11      **PRESIDING COMMISSIONER FISHER:**  Okay.  I'm

12   looking at some of the things you talked about

13   last year -- or last Board hearing.  There was

14   some questioning about whether or not you had

15   gone back to your house to get the gun --

16      **INMATE HAMMONS:**  Yes.

17      **PRESIDING COMMISSIONER FISHER:**  -- at your

18   last hearing.  Was the gun actually in the car

19   with you?

20      **INMATE HAMMONS:**  Yes.

21      **PRESIDING COMMISSIONER FISHER:**  And who's

22   gun was it?

23      **INMATE HAMMONS:**  My gun.

24      **PRESIDING COMMISSIONER FISHER:**  And how come

25   you carried it?

26      **INMATE HAMMONS:**  I've always carried a gun

27   when I was in the military and stuff.  I was --

1   At that time I just -- I was stationed in

2   Norfolk, Virginia and stuff, and I drove all the

3   way across country to come out here to do some

4   training to go over to Saudi Arabia at the time.

5       **PRESIDING COMMISSIONER FISHER:**  Okay.  So

6   had you been -- You'd been there and had come

7   back, and were getting ready to go again, is

8   that what was going on?

9       **INMATE HAMMONS:**  No, Ma'am.  I was stationed

10  in Norfolk, Virginia and stuff.  Then when

11  Saddam Hussein first invaded Kuwait I got orders

12  to come out here to Camp Pendleton to do some

13  training to go over there.  And when I came out

14  here, during the training, I was up in

15  Twenty-Nine Palms.  Then when I came down from

16  Twenty-Nine Palms we all decided to go out to a

17  club and stuff.  Then that's when -- That's the

18  night that I killed Mr. Santana.

19      **PRESIDING COMMISSIONER FISHER:**  Okay.

20      **INMATE HAMMONS:**  Then after that is when I

21  went to the Persian Gulf.

22      **PRESIDING COMMISSIONER FISHER:**  Okay.  And

23  so how long had you actually been at Camp

24  Pendleton?

25      **INMATE HAMMONS:**  I checked in Camp Pendleton

26  I think it was November 10th.  And then I went to

27  Twenty-Nine Palms for about 17 days, around 17,

33

1    I think.

2        **PRESIDING COMMISSIONER FISHER:**  Okay.

3        **INMATE HAMMONS:**  And stuff.

4        **PRESIDING COMMISSIONER FISHER:**  So you

5    don't --

6        **INMATE HAMMONS:**  I was out here in

7    California for about a month.

8        **PRESIDING COMMISSIONER FISHER:**

9    (Indiscernible) about a month?

10        **INMATE HAMMONS:**  Yes.

11        **PRESIDING COMMISSIONER FISHER:**  Okay.  So

12    you apparently weren't familiar with the fact

13    that a lot of the prostitutes on the street --

14        **INMATE HAMMONS:**  Yes.

15        **PRESIDING COMMISSIONER FISHER:**  -- are

16    transvestites.

17        **INMATE HAMMONS:**  Yes.

18        **PRESIDING COMMISSIONER FISHER:**  I guess the

19    overriding question in all of this is, you know,

20    here you are in a situation where doing what you

21    did just sort of exacerbated the situation you

22    found yourself in to begin with.  I mean not to

23    mention killing somebody and ending up in

24    prison, but to do something where all your

25    friends know --

26        **INMATE HAMMONS:**  Yes.

27        **PRESIDING COMMISSIONER FISHER:**  -- what

34

1    happened.

2    **INMATE HAMMONS:**  Yes.

3    **PRESIDING COMMISSIONER FISHER:**  Then your

4    wife is going to find out what happened.

5    **INMATE HAMMONS:**  Yes.

6    **PRESIDING COMMISSIONER FISHER:**  Why would

7    you not just beat this guy up and --

8    **INMATE HAMMONS:**  I was originally going to

9    do that, and then the person ran away from me

10   and stuff, and ran out of his jacket.  I had a

11   hold of him by his jacket, and I was just going

12   to beat him and stuff.  And he takes off running

13   and running out of the jacket, and I couldn't

14   find him.

15   **PRESIDING COMMISSIONER FISHER:**  All right.

16   Questions?

17   **DEPUTY COMMISSIONER MEJIA:**  No further

18   questions.

19   **PRESIDING COMMISSIONER FISHER:**  Okay.

20   Ms. Shess, do you have anything?

21   **DEPUTY DISTRICT ATTORNEY SHESS:**  I have a

22   couple of questions.  First about his military

23   history, the first is whether he actually served

24   over seas?

25   **PRESIDING COMMISSIONER FISHER:**  And if you

26   could just answer to me.

27   **INMATE HAMMONS:**  Yes, I have.

35

1    **PRESIDING COMMISSIONER FISHER:**  Okay.  And

2    can you -- Because I'm a little confused too.  I

3    know that you had said that you did.  But you

4    could clarify for me also, where you went and

5    when?

6    **INMATE HAMMONS:**  What year and stuff, I'm

7    been in Panama.

8    **PRESIDING COMMISSIONER FISHER:**  Okay.

9    **INMATE HAMMONS:**  Different places and stuff.

10   I don't for sure where she's referring, what

11   kind of question, Desert Storm or what?

12   **PRESIDING COMMISSIONER FISHER:**  Is there --

13   Because (indiscernible) for the timeline of it

14   in itself.

15   **DEPUTY DISTRICT ATTORNEY SHESS:**  Yeah.

16   **INMATE HAMMONS:**  With the case.

17   **PRESIDING COMMISSIONER FISHER:**  Yeah.

18   **INMATE HAMMONS:**  Okay.  With the case.  I

19   was stationed in Norfolk, Virginia.  I got

20   orders to come out to California to Camp

21   Pendleton.  I checked into Camp Pendleton

22   November the 10th.

23   **PRESIDING COMMISSIONER FISHER:**  Okay.

24   **INMATE HAMMONS:**  November the 10th.

25   **PRESIDING COMMISSIONER FISHER:**  And then

26   Twenty-Nine Palms?

27   **INMATE HAMMONS:**  Then I went to Twenty-Nine

1    Palms during this month and stuff.   December

2    10th, I killed Mr. Santana.   January 1st, I went

3    to -- got on a plane.   I went to Saudi Arabia,

4    and I was stationed at Desert Shield.   Then

5    Desert Storm --

6         **PRESIDING COMMISSIONER FISHER:**   Started.

7         **INMATE HAMMONS:**   -- started --

8         **PRESIDING COMMISSIONER FISHER:**   Okay.

9         **INMATE HAMMONS:**   -- in February.   Then I

10   came back to the states April 29th or 28th, from

11   the (indiscernible).

12        **PRESIDING COMMISSIONER FISHER:**   Okay.

13        **INMATE HAMMONS:**   I went on leave.   I went to

14   my wife's house, her house and stuff, in

15   Waterford, Texas, came back to Camp Pendleton

16   May 19th.   And May the 22nd, I was arrested.

17        **PRESIDING COMMISSIONER FISHER:**   Okay.   All

18   right.   That clears it up for me.   Does that

19   clear it up for you?

20        **DEPUTY DISTRICT ATTORNEY SHESS:**   It does.

21   Thank you.

22        **PRESIDING COMMISSIONER FISHER:**   All right.

23   Thank you.

24        **DEPUTY DISTRICT ATTORNEY SHESS:**   And during

25   the course of his time in the military did the

26   inmate get any sharp shooting medals?

27        **INMATE HAMMONS:**   In the military, in the

37

1    Marine Corps and stuff, you have to qualify and

2    be able to shoot once a year.  You go to the

3    range and shoot once a year and stuff.  And you

4    have to be qualified.  If you cannot pass

5    qualifications on a rifle range you will be

6    asked to leave the military.

7        **DEPUTY DISTRICT ATTORNEY SHESS:**  And would

8    you ask the inmate to explain to you what

9    critical mass is in relationship to firing at

10   another human being?

11       **PRESIDING COMMISSIONER FISHER:**  And I know,

12   but go ahead, you can tell me.

13       **INMATE HAMMONS:**  I don't understand.

14       **PRESIDING COMMISSIONER FISHER:**  You don't

15   know what critical mass is?

16       **INMATE HAMMONS:**  No.

17       **DEPUTY DISTRICT ATTORNEY SHESS:**  Isn't it --

18   Would you question him concerning his comments

19   to his cohort, Mr. Thornton, after the shooting

20   when he asked where did he hit Mr. Santana, and

21   he said, well, where do you think I hit him,

22   critical mass.  We're trained to kill.  Words to

23   that effect.

24       **INMATE HAMMONS:**  I understand the question

25   and stuff.

26       **PRESIDING COMMISSIONER FISHER:**

27   (Indiscernible).

38

1      **INMATE HAMMONS:**  I understand the question

2  and stuff.  I don't think it was critical mass.

3  It was center mass and stuff.  That's what

4  Mr. Thornton said in his statement.  I never

5  said that.  Mr. Thornton said that in his

6  statement.  And he gave like three or four

7  different statements.  I'm not for sure.  But

8  that would probably be a question for

9  Mr. Thornton to answer.

10      **PRESIDING COMMISSIONER FISHER:**  Can I

11  interject the question?

12      **DEPUTY DISTRICT ATTORNEY SHESS:**  Yes.  Of

13  course.

14      **PRESIDING COMMISSIONER FISHER:**  Did you ask

15  him -- or did he ask you, where you hit him?

16      **INMATE HAMMONS:**  No, Ma'am.

17      **PRESIDING COMMISSIONER FISHER:**  Okay.  Go

18  ahead.

19      **DEPUTY DISTRICT ATTORNEY SHESS:**  The inmate

20  indicated that he intended initially to try to

21  beat the victim up, but the victim was able to

22  get away from him, and he was left holding his

23  jacket.  Other than beating, can he be a little

24  bit more specific about what he intended to do

25  with him?

26      **INMATE HAMMONS:**  Fistfight.

27      **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay.  How

1    much time passed from the time he was left

2    holding the jacket until he found the victim?

3         **INMATE HAMMONS:**  I'd say around about 15

4    minutes, ten to 15 minutes.

5         **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay.  And

6    how far away did he live from the scene where he

7    was left holding the jacket?

8         **INMATE HAMMONS:**  I'd say about 20 minutes.

9    I think it came out in court from the time where

10   the victim was at, to back at my apartment that

11   I was at, I think one way was 22 minutes.  It

12   was in the 20 some minute range or somewhere.

13   That's just one way.

14        **DEPUTY DISTRICT ATTORNEY SHESS:**  Did you

15   live on base?

16        **INMATE HAMMONS:**  No, ma'am.

17        **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay.

18   Who's Mr. Buckley?

19        **INMATE HAMMONS:**  Mr. Buckley was a person

20   that was at the club with us that night.

21        **DEPUTY DISTRICT ATTORNEY SHESS:**  Was who?

22        **INMATE HAMMONS:**  A fellow Marine.

23        **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay.  And

24   do you have any kind -- Did he have any kind of

25   a beef with Mr. Buckley at all, any reason why

26   he might lie concerning what occurred?

27        **INMATE HAMMONS:**  Mr. Buckley wasn't even at

40

1   the scene.

2        **DEPUTY DISTRICT ATTORNEY SHESS:**  And how

3   does the inmate explain the fact that according

4   to Mr. Buckley, when he talked to Mr. Thornton

5   who was there at the scene, that Mr. Thornton

6   reported that after the inmate was left holding

7   the jacket he was basically furious.  They went

8   back to the inmate's house, retrieved the gun,

9   and then found the victim and shot him.

10       **ATTORNEY TARDIFF:**  I guess I'm going to have

11  to start objecting at this point.  We're not

12  here to retry the case.  He's fully admitted

13  responsibility.  The fact -- You know, unless

14  you have a point as to whether or not what these

15  question are being asked for as to his

16  suitability for parole, we don't need to retry

17  it, the case here.  That's done.

18       **PRESIDING COMMISSIONER FISHER:**  All right.

19  I think what -- Let me see if I understand.  I

20  think what you're getting to is the amount of

21  premeditation.

22       **DEPUTY DISTRICT ATTORNEY SHESS:**  Correct.

23       **ATTORNEY TARDIFF:**  But that's already been

24  litigated as well.

25       **PRESIDING COMMISSIONER FISHER:**  Right,

26  right.  It has been.  Is there anything else?

27       **DEPUTY DISTRICT ATTORNEY SHESS:**  Yes.  Why

1    did he feel it was necessary to kill him?

2        **ATTORNEY TARDIFF:**  Again, I'm going to

3    object.  It's been tried.  He's admitted he

4    killed the guy.

5        **PRESIDING COMMISSIONER FISHER:**  Well, let me

6    -- I'd like to hear what he has to say because I

7    think it goes to insight.  So why kill him?

8        **INMATE HAMMONS:**  At that time I had a really

9    -- Over the years, after being in prison and

10   stuff, I had to look at this and stuff, and I've

11   asked myself that many, many times and stuff, is

12   why did I kill Mr. Santana that night?  Why

13   couldn't I just leave the scene and stuff?  The

14   best way I guess I can answer that is at that

15   time that was all the tools that I had that I

16   can handle with that situation and stuff.  But

17   that's not me from today.  Today I'm a changed

18   person from that town and stuff.  And I have

19   tools where I can operate and stuff, and

20   everything, and would never go to that extreme

21   like I did that night.

22       **PRESIDING COMMISSIONER FISHER:**  So to follow

23   up on her question, was it just you were just so

24   made that you --

25       **INMATE HAMMONS:**  I was enraged.  I was

26   enraged that night.

27       **PRESIDING COMMISSIONER FISHER:**  It kind of

1    is the same question that I asked, you know, why

2    not just beat him up?

3        **INMATE HAMMONS:**  I was in a rage that night

4    and stuff.

5        **PRESIDING COMMISSIONER FISHER:**  Because let

6    me put it this way, you were a good shot.  You

7    could have just hurt him.  You could have shot

8    his knee out.

9        **INMATE HAMMONS:**  Yes.  Honestly I can say I

10   never really thought about it.  It just

11   happened, you know.  When that time when I was

12   in the Marines and stuff, I was kind of trained

13   to just react.  You don't hesitate.  You just

14   react without thinking and stuff, and that's

15   what I did.

16       **PRESIDING COMMISSIONER FISHER:**  Okay.

17   Anything else?  (Indiscernible) question?

18       **DEPUTY DISTRICT ATTORNEY SHESS:**  No, no, no.

19   You're down the same line I am.  I do have one

20   follow up question, because often when a

21   shooting occurs, especially a shooting that is

22   presented as being rage shooting, the actual

23   sight of seeing someone fall, seeing them

24   bleeding in front of the shooter, sometimes

25   create a different reaction.  I wonder if you'd

26   ask the inmate how he felt when he saw

27   Mr. Santana drop and saw him land on the

43

1    sidewalk?  Did he even consider helping him?

2        **INMATE HAMMONS:**  No, I didn't consider

3    helping him.  As soon as the gun -- As soon as I

4    shot, I put the car in drive and I drove off.

5        **DEPUTY DISTRICT ATTORNEY SHESS:**  And one

6    last question, does he have any argument with

7    the information that when he left the scene with

8    his cohort basically they got something to eat,

9    hid he gun, and he never admitted any

10   responsibility for this until many years into

11   his prison sentence?

12       **PRESIDING COMMISSIONER FISHER:**  Is that

13   correct?

14       **ATTORNEY TARDIFF:**  Well, it wasn't many

15   years.  He's already testified a couple of

16   years.

17       **PRESIDING COMMISSIONER FISHER:**  Okay.

18       **ATTORNEY TARDIFF:**  And the documents state

19   that.

20       **PRESIDING COMMISSIONER FISHER:**  But aside

21   from that, what you did that night, is that

22   essentially correct?

23       **INMATE HAMMONS:**  No.

24       **PRESIDING COMMISSIONER FISHER:**  Okay.  What

25   did you do?

26       **INMATE HAMMONS:**  I didn't hide no gun.

27       **PRESIDING COMMISSIONER FISHER:**  Okay.  What

44

1    did you do?

2        **INMATE HAMMONS:**  And stuff -- I went back to

3    my apartment.

4        **PRESIDING COMMISSIONER FISHER:**  Okay.  What

5    did you do with the gun?

6        **INMATE HAMMONS:**  I put the gun -- I took the

7    gun out of the car and stuff, went into my

8    apartment, hung it up into the closet and locked

9    the closet.

10        **PRESIDING COMMISSIONER FISHER:**  Okay.  Did

11    you continue to carry it as you --

12        **INMATE HAMMONS:**  No, no.  I put it up in a

13    closet and stuff.  And the detectives the next

14    day went to my apartment, opened up the closet

15    and got the gun.

16        **DEPUTY DISTRICT ATTORNEY SHESS:**  Let me ask

17    one more question because I just want to make

18    sure I understood this.  The gun that he always

19    carried in the car, he then decided to take out

20    of the car and hang in the closet?

21        **INMATE HAMMONS:**  Yes, yes.  Yes,

22    (indiscernible) and stuff, because of what

23    happened that night.

24        **DEPUTY DISTRICT ATTORNEY SHESS:**  I have no

25    further questions.

26        **ATTORNEY TARDIFF:**  I have no questions.

27        **PRESIDING COMMISSIONER FISHER:**  I have just

45

1    one just to clear up, because I'm

2    (indiscernible).  You didn't get arrested

3    until --

4        **INMATE HAMMONS:**  After I came back from

5    Desert Storm.

6        **PRESIDING COMMISSIONER FISHER:**  It was like

7    May?

8        **INMATE HAMMONS:**  Yes.

9        **PRESIDING COMMISSIONER FISHER:**  Now, just

10   now you said you took the gun out and you hung

11   it up in the closet, and the next day the

12   detectives came and got it out of the closet.

13       **INMATE HAMMONS:**  Yes.  The detectives knew

14   all about it the next day.

15       **PRESIDING COMMISSIONER FISHER:**  Okay.  All

16   right.

17       **INMATE HAMMONS:**  They choose not to arrest

18   me.  They wanted to send me over to Desert

19   Storm.  Then if I survived that, and came back

20   then, they was going to prosecute me.

21       **PRESIDING COMMISSIONER FISHER:**  All right.

22   Got you.  All right.  It's confusing.

23       **INMATE HAMMONS:**  Yeah.

24       **ATTORNEY TARDIFF:**  Another body.

25       **INMATE HAMMONS:**  Yeah, yeah.

26       **PRESIDING COMMISSIONER FISHER:**  Ms. Shess,

27   would you like to close?

1      **DEPUTY DISTRICT ATTORNEY SHESS:**  Yes.  Thank

2      you.  At this time we're asking the Board to

3      find Mr. Hammons unsuitable for parole.  He does

4      pose an unreasonable risk of danger to society

5      if released.  I think there are a number of

6      factors which support this.  But initially I do

7      want to note that he did in fact stick with the

8      program as the Board directed him to in 2001.

9      However, he does have an unstable social

10     history.  He does still have a history of

11     institutional misconduct, which was not minor.

12     So his gain in that area is really relatively

13     short.  He has incomplete parole plans, no

14     letters of support or job opportunities, or

15     places to live in either location.  His

16     psychiatry evaluations I would propose to the

17     Panel are simply unreliable because he has been

18     untruthful to the psychiatrist with regard to a

19     fundamental part of what occurred.  Based on the

20     investigative reports, the statements made, the

21     evidence clearly shows that this was a

22     premeditated and deliberate act.  He returned

23     home and got the gun.  He specifically aimed at

24     Mr. Santana's neck to ensure that he killed him.

25     He wasn't so drunk that he couldn't hit him in

26     the neck, a fairly small area to hit.  And he

27     continues to hide behind that I was drunk.  I

1   didn't know what I was doing.  The motive was

2   just inexplicable.  The victim was particularly

3   vulnerable.  This man didn't even want to press

4   charges when he was calling the police and

5   reporting this.  He simply said I just want my

6   jacket back.  It's Christmas time.  I don't want

7   to cause any trouble.  And one thing that I

8   would specifically note is that he's talked

9   about being in a rage at the time that this

10  occurred, and proposes to this Panel that he has

11  more tools to deal with that.  When in fact,

12  he's not gotten the key tool that this Panel

13  asked him to three years ago.  He's not taken

14  any anger management.  He's not even really

15  admitting too much to that.  I think that's

16  going to be fundamental area that he's going to

17  have to explore for many, many more years before

18  he is ready to be released.  At this point we're

19  asking for a maximum denial on him.  We do think

20  that he does create an unreasonable risk of

21  danger.

22      **PRESIDING COMMISSIONER FISHER:**  Thank you.

23  Counsel.

24      **ATTORNEY TARDIFF:**  Yes.  First I'll respond

25  to the District Attorney's remarks.  I do not

26  believe that there's been an established pattern

27  of an unstable social history.  In fact, if

48

```
 1    anything it was stable.  He's a high school
 2    graduate, had no prior criminal history, no gang
 3    involvement, was in the military for a number of
 4    years, obtained a rank of E-4.  The most
 5    significant unstable factor would have been his
 6    substance abuse before the commitment offense.
 7    But other than that, it was not -- he does not
 8    have an unstable social history.  And currently
 9    he maintains continuous contact with family
10    members and continues to be stable.  His history
11    of 115s, there are only two, and yet they are
12    violent.  There's no doubt about that, and
13    that's serious.  But, again, time is -- He's
14    (indiscernible) himself time wise.  And the last
15    one was over six years ago.  So he's definitely
16    almost to the point where those should no longer
17    be used against him.  The issue of
18    (indiscernible) psych is unreliable.  I submit
19    that all of his psychiatric evaluations have
20    been positive and supportive.  And I'll get into
21    that in a minute.  I disagree with that
22    statement as well.  It stated that he has never
23    really admitted the rage.  Today he readily
24    admitted he was definitely in a rage.  I don't
25    know how much more he needs to admit.  And in
26    terms of whether or not he has more tools today,
27    there's reference in the psych evals to that
```

1    effect.  So it's not just something he said, but

2    it's something that the evaluations also

3    substantiate.  And asking for a maximum denial

4    of five years is --

5      (Thereupon, the tape was changed to side two)

6        **DEPUTY COMMISSIONER MEJIA:**  We're on side B.

7    Continue please.

8        **ATTORNEY TARDIFF:**  In terms of his

9    pre-incarceration history, I've gone into that.

10   I do not find -- The only unsuitable factor that

11   could be used to deny parole would be the

12   substance abuse issue.  But I believe that

13   that's also been cleared up since he's been

14   incarcerated in terms of he understands and

15   agrees that he has a severe substance abuse

16   history.  But the '05 evaluation also states

17   that it's very unlikely that he will ever drink

18   again.  And I'll go into that a little bit more

19   when I get into the psych evals.  In terms of

20   the commitment offense itself, he admittedly

21   admits responsibility.  The psych eval state

22   that he is remorseful.  He understands the

23   commitment offense.  The probation officer's

24   report does state some factors in the evaluation

25   under circumstances supporting a grant of

26   probation.  They note that he lacked any prior

27   record.  And the court may wish to consider this

1    case an unusual circumstance actually to grant
2    him probation.  Also, the defendant is 25 years
3    old and has completed 12 years of education, and
4    has served in the Marine Corps since '88.  His
5    service record reflects participation in Desert
6    Storm.  So those are all factors.  I would also
7    like to submit that it is extremely unlikely
8    that this type of situation would arise again,
9    extremely unlikely.  In terms of
10   post-incarceration history, he has programmed in
11   an exemplary manner.  He has obtained three
12   vocations.  He has continued to participate in
13   self-help.  He's done AA for ten years.  The
14   impact program as we know is a very intense
15   program, which he's completed.  And he's also
16   done one-on-one therapy, which he may address,
17   and it could have gone into some of the anger
18   issues, which seem to be present.  And, again, I
19   spoke about the 115s, six years he's been
20   without.  And he continues to be
21   disciplinary-free.  And I know that they were
22   violent, and he is putting his years behind
23   that.  His most recent psych eval, much of it
24   has been already submitted into the record.  But
25   it does state under his social part, he writes
26   and receives letters from his daughters, mothers
27   and brothers each week.  It states his judgment

51

1   and impulse control is very good.  He

2   demonstrates rational logical thinking.  There's

3   not any evidence of a thought disorder, and his

4   prognosis for adjustment to the community is

5   very good.  Under the assessment of

6   dangerousness, it does take into consideration

7   the 115s.  And it says:

8           "Despite this behavior he does not

9            have a significant juvenile

10           criminal history and no history of

11           gang involvement.  Therefore, he

12           poses no more of a risk than the

13           average citizen.  And this is part

14           of the report that says it is

15           significant that Inmate Hammons

16           realizes that he was without the

17           coping skills required, which

18           included knowledge, as well as

19           psychological skills, to avoid

20           alcohol and deal with his emotions

21           in situations correctly."

22  The psych eval before that in '01 was also

23  supportive of release.  It stated that -- It

24  goes into some -- He did do chemical dependency

25  class, which is a six-month course in '96.  His

26  prognosis for community living is very good.  He

27  admitted responsibility for the death of the

52

1  victim.  He did appear to be repentant for his

2  crime, and appears to fully understand the

3  circumstances leading up to the instant offense.

4  He appears to have gained insight from the

5  groups he's attended.  His violence potential if

6  released to the community is no more than the

7  average citizen.  The evaluation before that in

8  '97 stated he showed good insight into his

9  commitment offense and his judgment was

10  estimated to be good, no evidence of a thought

11  or mood disorder.  That he had prosocial values.

12  Violence potential, below the average -- average

13  relative of the inmate as long as he remains

14  sober.  And then in '95 the evaluation, he had a

15  high GAF score of 85.  It states that:

16          "He is one of the many lifers who

17          has committed a crime under the

18          influence of alcohol and presents

19          as a relatively normal individual

20          otherwise.  He understands that if

21          he ever drinks again his resulting

22          poor impulse control and impaired

23          judgment would probably get him

24          right back into prison.  Violence

25          potential is considered below

26          average for inmates level III."

27  Obviously if he starts drinking this will

1   increase that risk.  And it concluded that he

2   seems to have good insight into his criminal

3   behavior and is beginning to come to terms with

4   the consequences of his criminal act.  And,

5   again, that was ten years ago.  And since then

6   his evaluations have just improved.  So I would

7   submit that -- And I do agree that his parole

8   plans are weak.  There's no doubt about it.  But

9   if he did get a date I'm sure he could firm

10  those up.  It's obvious that he has strong

11  family support, and they would be willing to

12  also support him here in California.  As we

13  know, all that's checked out upon receiving a

14  date.  And I'm sure he could provide the

15  documents if he received a date.  So I would

16  submit that I do think that he is suitable for

17  parole.  But if he is not found suitable that he

18  only be given a one-year denial since he has

19  complied with all the request of the prior

20  Board, and he's remained disciplinary-free for

21  six years, continuing to program and participate

22  in self-help.  Thank you.

23     **PRESIDING COMMISSIONER FISHER:**  Mr. Hammons,

24  is there anything you'd like to add?

25     **INMATE HAMMONS:**  No.

26     **PRESIDING COMMISSIONER FISHER:**  Okay.  I'm

27  going to go ahead and recess.  We'll call you

54

1    back as soon as we have our decision.

2                         R E C E S S

3                         --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

55

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER MEJIA:** We're on the

4    record for the decision in the matter of

5    Mr. Hammons.

6    **PRESIDING COMMISSIONER FISHER:** All right.

7    Thank you. I want to note for the record that

8    everyone who was previously in the room and

9    identified themselves have returned to the room.

10   And, Mr. Hammons, after reviewing all of the

11   information received from the public the Panel.

12   has come to the conclusion that you're not yet

13   suitable for parole and would pose an

14   unreasonable risk or danger to society if

15   released from prison. I'm going to tell you

16   rather than just going through the decision and

17   having you have to wait that this a two-year

18   denial. I'm going to tell you -- I'm going to

19   try to be as specific as I can about what we

20   need to see you do. All right. The first thing

21   that we considered in coming to our decision was

22   the commitment offense. This was the murder of

23   Carlos Santana. It was a situation where

24   Mr. Hammons and his friends were out partying.

25   They decided to go pick up a prostitute. As it

26   turns out the prostitute that Mr. Hammons was

27   **JEFFREY HAMMMONS      H-23227      DEC PAGE 1    10/4/05**

56

1   not a woman, and upon discovering that he became

2   very angry. You know, the bottom line with this

3   Mr. Hammons is that there are a lot of choices

4   you could have made that night, and I'm sure

5   you're aware of them all. You probably thought

6   about them a million times. You could have

7   beaten this guy up. You could have ignored it

8   and walked away or, like I said earlier, you

9   could have blown out his kneecap.

10   **INMATE HAMMONS:** Yes.

11   **PRESIDING COMMISSIONER FISHER:** But you

12   killed him, you know. I can even understand

13   where you were probably at mentally at the time,

14   you know. You were a young guy who just came

15   out of -- came out to Camp Pendleton. They had

16   you out in Twenty-Nine Palms working your tail

17   off, I'm sure getting ready to go over to the

18   Middle East. You were probably pumped up with

19   testosterone. It still doesn't excuse --

20   **INMATE HAMMONS:** Yes.

21   **PRESIDING COMMISSIONER FISHER:** -- making

22   this kind of a decision. And, you know, what

23   this man died for was just so trivial

24   (indiscernible). Mr. Hammons does not have a

25   prior criminal history. He seems to have a

26   stable social history. And he has been

27   **JEFFREY HAMMMONS   H-23227   DEC PAGE 2   10/4/05**

57

1   programming well.  You do have those two 115s,

2   both of them for mutual combat.

3        **INMATE HAMMONS:**  Yes.

4        **PRESIDING COMMISSIONER FISHER:**  Most

5   recently in '99.  And I know it seems like

6   that's been a long time, but I'll tell you what,

7   I'm seeing grants come back from the Governor

8   that are rejected because somebody hasn't been

9   disciplinary-free for more than ten years.

10  That's going to be real important for you.

11       **INMATE HAMMONS:**  Yeah.

12       **PRESIDING COMMISSIONER FISHER:**  Especially

13  you don't want to get in anymore mutual combats,

14  but no 115s.  The other thing, and let me just

15  say that this relates to the two years, rather

16  than go through all of this a second time,

17  obviously the crime relates to the two-year

18  denial.  But also in the area of programming

19  you've been doing a good job.  You've got three

20  vocations, but you still have some work that you

21  need to do with self-help.  And you're going to

22  need some time to do that.  And I'll be honest

23  with you, Mr. Hammons, I always -- I try to be

24  real pragmatic about what's reasonable in

25  denials.  And you have at least a couple of

26  years work to do here.  And I don't know that

27  **JEFFREY HAMMMONS     H-23227     DEC PAGE 3   10/4/05**

58

1    that's going to be long enough.  But I want you

2    to understand that you're heading in the right

3    direction.  I don't want you to be discouraged.

4    I just know what the Board is looking for, and I

5    know what the Governor is going to be looking

6    for once you get a date.  And so it's going to

7    take you a couple of years to continue to get

8    away from those 115s.  You need to get involved

9    in some anger management.  Like Commissioner

10   Mejia said, if you can't do it through the

11   institution, do it on your own.

12        **INMATE HAMMONS:**  Yes.

13        **PRESIDING COMMISSIONER FISHER:**  Get some

14   books or some tapes, you know.  If your family

15   can send you stuff.  And what you can do is the

16   next time you come to Board just do kind of a

17   book report.

18        **INMATE HAMMONS:**  Okay.

19        **PRESIDING COMMISSIONER FISHER:**  The other

20   thing that we need for you to do over the next

21   couple of years is really start firming up your

22   parole plans.  If you are going to try parole

23   out to an institutional kind of setting like the

24   halfway house kind of thing in California, start

25   writing some letters.  Even if you don't get a

26   commitment from them, bring copies of the

27   **JEFFREY HAMMMONS    H-23227    DEC PAGE 4   10/4/05**

59

1    letters that you've written.  Bring copies of

2    the letters that they've written to you that

3    shows that you're being proactive.  Start

4    looking into both in the area in California

5    where you might parole to, as well as Kentucky,

6    if you're granted an out of state parole.  Start

7    looking into what kind of substance abuse

8    programs are available to you.  Just get really

9    proactive in starting to put a plan together.

10        **INMATE HAMMONS:**  Okay.

11        **PRESIDING COMMISSIONER FISHER:**  Okay.

12        **ATTORNEY TARDIFF:**  Can I interject for a

13    minute?  I didn't find this out until after when

14    we recessed, but he was just moved from one

15    facility to the other.  And all his property, he

16    wasn't able to get it.  And he's got letters.

17        **PRESIDING COMMISSIONER FISHER:**  Okay.  Okay.

18    And I saw from the prior transcript that you had

19    letters from your family at your last hearing,

20    and I'm aware of that.  And I know that it can

21    be aggravating to have to do it every time, but

22    you do.

23        **INMATE HAMMONS:**  Yes.

24        **PRESIDING COMMISSIONER FISHER:**  You know, so

25    just do it.  But like I said, the main for us is

26    that this was clearly a crime of anger.

27    **JEFFREY HAMMMONS    H-23227    DEC PAGE 5    10/4/05**

60

1      **INMATE HAMMONS:**  Yes.

2      **PRESIDING COMMISSIONER FISHER:**  And lack of

3  control.  And so those are the areas that we

4  want to see you really focus on, as well as the

5  substance abuse programming.  And just don't

6  ever get another 115.

7      **INMATE HAMMONS:**  Yes.

8      **PRESIDING COMMISSIONER FISHER:**  And continue

9  to just do as much as you can to make yourself

10  suitable.

11      **INMATE HAMMONS:**  Okay.

12      **PRESIDING COMMISSIONER FISHER:**  All right.

13  I have to tell you one of the things that we

14  talked about during deliberations what a

15  tremendous waste --

16      **INMATE HAMMONS:**  Yes.

17      **PRESIDING COMMISSIONER FISHER:**  -- this is.

18  I mean you were -- You know, you should be a

19  hero right now.  And we just see this as a

20  tremendous waste.  So just keep working.

21      **INMATE HAMMONS:**  Yeah.

22      **PRESIDING COMMISSIONER FISHER:**  Don't get

23  discouraged, and just know that at some point

24  you've got to work your way out of here.  All

25  right.  That completes the reading of the

26  decision.  Do you have any comments?

27  **JEFFREY HAMMMONS    H-23227    DEC PAGE 6   10/4/05**

61

1    **DEPUTY COMMISSIONER MEJIA:** I agree with

2    everything you said. Good luck to you. You're

3    heading in the right direction. Keep the focus

4    in there.

5    **INMATE HAMMONS:** Okay.

6    **DEPUTY COMMISSIONER MEJIA:** Don't go to the

7    (indiscernible). Okay.

8    **INMATE HAMMONS:** Okay.

9    **DEPUTY COMMISSIONER MEJIA:** Thank you.

10    **INMATE HAMMONS:** All right. Thank you.

11                          --o0o--

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED TWO YEARS

24    THIS DECISION WILL BE FINAL ON:Feb. 1, 2006

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    JEFFREY HAMMMONS   H-23227   DEC PAGE 7   10/4/05

62

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CONNIE MASTIN, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 61, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JEFFREY HAMMONS, CDC No. H-23227, on OCTOBER 4, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 18, 2005, at Sacramento County, California.

Connie Mastin
Connie Mastin
Transcriber
**PETERS SHORTHAND REPORTING**